UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| COLLIN G. WARD and PEGGY D. WARD, | Civil Action No.: 5:17-cv-142-OC-39-PRL |
| Plaintiff, | |
| v. | COMPLAINT AND JURY DEMAND |
| JOHNSON & JOHNSON and ETHICON, INC., | |
| Defendants. | |

## COMPLAINT

Come now Plaintiffs, Collin G. Ward and Peggy D. Ward (Collectively, "Plaintiffs"; Collin Ward may be referred to individually as "PLAINTIFF"), by and through undersigned counsel, and bring this action against Defendants Ethicon, Inc. and Johnson & Johnson (hereinafter "Defendants"), and allege as follows:

### Parties

1. Plaintiffs are, and were, at all relevant times, citizens and residents of Florida and the United States.

2. Defendant Johnson & Johnson ("J&J") is a corporation incorporated in New Jersey, and according to its website, the world's largest and most diverse medical device and diagnostics company, with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey. Defendant J&J is a citizen of New Jersey.

3. Defendant J&J organizes its subsidiary business into Business Units to coordinate the development, manufacture, testing, marketing promotion, training, distribution and sale of its

products, including but not limited to its hernia repair mesh products. Within J&J there are three sectors: Medical devices and diagnostics, pharmaceutical, and consumer. Within the medical devices and diagnostic sector are "Business Units" including the "Ethicon Franchise." The Ethicon Franchise was charged by J&J with its design, development, promotion, marketing, testing, training, distribution and sale of the hernia repair mesh products at issue in this case. The Company Group Chairman and Worldwide Franchise Chairman for the Ethicon Franchise, Gary Pruden, is employed by J&J. The companies which comprise the Ethicon Franchise are thus controlled by J&J and include, but are not limited to, Ethicon, Inc.

4. Defendant Ethicon, Inc. ("Ethicon") is a wholly owned subsidiary of Defendant Johnson & Johnson. Defendant Ethicon, Inc. is a corporation incorporated in the State of New Jersey with its principal place of business in Somerville, New Jersey. Ethicon is a citizen of New Jersey.

5. Ethicon is a medical device company involved in the research, development, testing, manufacture, production, marketing, promotion and/or sale of medical devices including Physiomesh (hereinafter may be referred to as the "product").

6. J&J, directly and/or through the actions of Ethicon, Inc., has at all pertinent times been responsible for the research, development, testing, manufacture, production, marketing, promotion, distribution and/or sale of Physiomesh.

7. Defendants are individually, jointly and severally liable to Plaintiffs for damages suffered by Plaintiffs arising from the Defendants' design, manufacture, marketing, labeling, distribution, sale and placement of its defective mesh products at issue in the instant action, effectuated directly and indirectly through their respective agents, servants, employees and/or

owners, all acting within the course and scope of their representative agencies, services, employments, and/or ownership.

8. Defendants are vicariously liable for the acts and/or omissions of its employees and/or agents who were at all times relevant hereto acting on behalf of Defendants and within the scope of their employment or agency with Defendants.

## Jurisdiction and Venue

9. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between Plaintiffs and all Defendants. The amount in controversy exceeds $75,000, exclusive of interests and costs.

10. This Court has personal jurisdiction over each of the Defendants pursuant to the Florida Long-Arm Statute, *Fla. Stat. § 48.193*. Defendants transact business in Florida, and contract to provide materials, or things processed, serviced, or manufactured by Defendants used or consumed within Florida in the ordinary course of commerce, trade, or use. Defendants' tortious acts and omissions caused injury to Plaintiffs in the State of Florida. Defendants have purposefully engaged in the business of developing, manufacturing, publishing information, marketing, distributing, promoting and/or selling, either directly or indirectly, medical devices, including Physiomesh products, in Florida, for which they derived significant and regular income. The Defendants reasonably expected that their defective mesh products, including Physiomesh, would be sold and implanted in Florida.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## Facts Common to All Counts

12. Plaintiff Collin Ward was implanted with a Physiomesh (PHY1015V) device at Leesburg Regional Medical Center/The Villages Regional Hospital in Leesburg, FL in an attempt

to repair an umbilical hernia.

13. Defendants manufactured, sold, and/or distributed the Physiomesh device to Plaintiffs, through his doctors, to be used for treatment of hernia repair.

14. On or about June 17, 2016, Plaintiff underwent surgery at Leesburg Regional Medical Center in Leesburg, FL for recurrence of umbilical hernia after his Physiomesh device failed. The operating physician noted that there were adhesions to the intra-abdominal wall, which had to be removed.

15. Defendants were responsible for the research, design, development, testing, manufacture, production, marketing, promotion, distribution and sale of Physiomesh, including providing the warnings and instructions concerning the product.

16. Among the intended purposes for which Defendants designed, manufactured, and sold Physiomesh was for use by surgeons during hernia repair surgeries; the very purpose for which the Physiomesh was implanted in Plaintiff.

17. Defendants represented to Plaintiff and Plaintiff's physicians that Physiomesh was a safe and effective product for hernia repair.

18. Defendants' Physiomesh was defectively designed and/or manufactured, was not reasonably safe for its intended use in hernia repair, and the risks of the design outweighed any potential benefits associated with its design. As a result of the defective design and/or manufacture of the Physiomesh, there was an unreasonably risk of severe adverse reactions to the mesh or mesh components, including: chronic pain, recurrence of hernia, foreign body response, rejection, infection, inadequate or failure of incorporation/ingrowth, migration, scarification, deformation of mesh, improper wound healing, excessive and chronic inflammation, adhesions to internal organs, erosion, abscess, fistula formation, granulomatous response, seroma formation, nerve damage,

tissue damage, death, and other complications.

19. Physiomesh has a unique design incorporating five (5) distinct layers: two layers of polyglecaprone-25 ("Monocryl") film covering two underlying layers of polydioxanone film ("PDS"), which in turn coat a polypropylene mesh. This design is not used in any other hernia repair product sold in the United States. The multi-layer coating was represented and promoted by the Defendants to prevent or minimize adhesion and inflammation and to facilitate incorporation of the mesh into the body, but it did not. Instead, the multi-layer coating prevented adequate incorporation of the mesh into the body and caused or contributed to an intense inflammatory and chronic foreign body response resulting in an adverse tissue reaction including migration and damage to surrounding tissue in the form of sclerotic, granulomatous and/or fibrotic tissue and improper healing.

20. When affixed to the body's tissue, the impermeable multi-layer coating of the Physiomesh prevents fluid escape, which leads to seroma formation, and which in turn can cause infection, abscess formation and other complications.

21. The multi-layer coating provides a breeding ground for bacteria in which the bacteria cannot be eliminated by the body's immune response, which allows infection to proliferate.

22. The multi-layer coating of Defendants' Physiomesh is cytotoxic, immunogenic, and not biocompatible, which causes or contributed to complications such as delayed would healing, inflammation, foreign body response, rejection, infection, and other complications.

23. Defendants knew or should have known of the cytotoxic and immunogenic properties of the multi-layer coating of the Physiomesh prior to introducing it into the stream of commerce.

24. The polypropylene mesh portion of the Physiomesh was insufficient to withstand normal abdominal force, which resulted in recurrent hernia formation and/or rupture and deformation of the mesh itself.

25. When the multi-layer coating of the Physiomesh is disrupted and/or degrades, the "naked" polypropylene mesh is exposed to the adjoining tissue and viscera, and can become adhered to organs, cause damage to organs, and potentiate fistula formation.

26. These manufacturing and design defects associated with the Physiomesh were directly and proximately related to the injuries suffered by Plaintiff.

27. Neither Plaintiff nor his implanting physicians were adequately warned or informed by Defendants of the defective and dangerous nature of Physiomesh. Moreover, neither Plaintiff nor his implanting physician were adequately warned or informed by Defendants of the risks associated with the Physiomesh or the frequency, severity, or duration of such risks.

28. The Physiomesh implanted in Plaintiff failed to reasonably perform as intended. The mesh failed, caused serious injury, and necessitated additional invasive surgery to repair the hernia that the Physiomesh was initially implanted to treat,

29. Plaintiff's severe adverse reaction, and the necessity for surgical removal of the Physiomesh, directly and proximately resulted from the defective and dangerous condition of the product and Defendants' defective and inadequate warnings about the risks associated with the product, and the frequency, severity, and duration of such risks. Plaintiff has suffered and will continue to suffer both physical injury and pain and mental anguish, permanent and severe scarring and disfigurement, and has incurred substantial medical bills and other expenses, resulting from the defective and dangerous condition of the product as well as from Defendant's defective and inadequate warnings about the risks associated with the product.

# COUNT I
## Strict Product Liability: Defective Design

30. Plaintiffs incorporate herein by reference the allegations in paragraph 12 through 29 as if fully set forth herein.

31. At the time the Physiomesh was implanted in Plaintiff's body, the product was defectively designed. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended, and Defendants failed to design against such dangers, and failed to provide adequate warnings and instructions concerning the risks.

32. Defendants expected and intended the Physiomesh product to reach users such as Plaintiff in the condition in which the product was sold.

33. The implantation of Physiomesh in Plaintiff's body was medically reasonably and was a type of use that Defendants intended and foresaw when it designed, manufactured and sold the product.

34. The risks of the Physiomesh design significantly outweigh any benefits that Defendants contend could be associated with the product's design. The multi-layer coating, which is not used in any other hernia mesh product sold in the United States, prevents tissue from incorporating into the mesh, leading to encapsulation, deformation, scarification, migration, erosion, and rejection. The impermeable multi-layer coating leads to seroma formation, and provides a breeding ground for infection, and protects bacteria from being eliminated by the body's nature immune response.

35. The multi-layer coating of the Physiomesh, which was marketed, promoted, and intended as a barrier against adhesion to the internal organs, was only temporary; it was expended

and intended to degrade over time inside the body. Thus, this coating prevented tissue ingrowth in the short term, and degraded in the long-term, eventually leaving the "naked' polypropylene mesh exposed to the internal viscera and tissues. The degradation of this multi-layer coating caused or exacerbated an intense inflammatory and foreign body reaction. Once exposed to the viscera, the polypropylene mesh will inevitably adhere to and can erode into and through the viscera, initiating a cascade of adverse consequences. Any purported beneficial purpose of the multi-layer coating (to prevent adhesion to the internal viscera and organs) was non-existent; the product provided no benefit while substantially increasing the risks to the patient.

36. The polypropylene mesh within the defective multi-layer coating of the Physiomesh was in itself dangerous and defective, particularly when used in the manner intended by Defendants in the Physiomesh. When implanted adjacent to the intestines and other internal organs, as Defendants intended for Physiomesh, polypropylene mesh is unreasonably susceptible to adhesion, bowel perforation or erosion, fistula formation, bowel strangulation or hernia incarceration, and other injuries.

37. The polypropylene mesh used in the Physiomesh device was insufficient in strength to withstand the internal forces of the abdomen after implantation, which made the device susceptible to rupture and/or deformation.

38. The appropriate treatment for complications with Physiomesh involves additional invasive surgery to remove the mesh from the body, thus eliminating any purported benefit that the mesh was intended to provide to the patient.

39. Physiomesh was designed and intended for intraperitoneal implantation, which involved the product being implanted in contact with the intestines and/or other internal organs, which unnecessarily increased the risks of adhesion, erosion, fistula formation, and other injuries.

40. At the time the Physiomesh was implanted in Plaintiff, there were safer feasible alternative designs for hernia mesh products that would have prevented the injuries he suffered.

41. The Physiomesh product cost significantly more than competitive products because of its unique multi-layer coating, even though the multi-layer coating provided no benefit to consumers, and increased the risks to patients implanted with these devices.

42. The Physiomesh implanted in Plaintiff failed to reasonably perform as intended, and necessitated further invasive surgery to repair the very issue that the product was intended to repair; thus it provided no benefit to him.

43. As a direct and proximate result of the defective and unreasonably dangerous condition of the product, Plaintiff suffered injuries and damages as summarized herein.

## COUNT II
### Strict Product Liability: Failure to Warn

44. Plaintiffs incorporate herein by reference the allegations in paragraphs 12 through 29 as if fully set forth herein.

45. At the time the Physiomesh was implanted in Plaintiff's body, the warnings and instructions provided by Defendants for the Physiomesh were inadequate and defective. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended, and Defendants failed to design and/or manufacture against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

46. Defendants expected and intended the Physiomesh product to reach users such as Plaintiff in the condition in which the product was sold.

47. Plaintiff and his physicians were unaware of the defects and dangers of Physiomesh, and were unaware of the frequency, severity and duration of the defects and risks associated with the Physiomesh.

48. The Defendants' Instructions for Use provided with the Physiomesh expressly understates and misstates the risks known to be associated specifically with the Physiomesh by stating that "Potential adverse reactions are those typically associated with surgically implantable materials." No other surgical mesh sold in the United States – and no other "surgically implantable material" – suffers the same serious design flaws as Physiomesh. No other device or material contains the dangerous and defective multi-layer coating, which itself causes or increases the risks of numerous complications, including prevention of incorporation, increased risk of seroma formation, immunologic response, increased risk for infection, and increased inflammatory reaction and foreign body response. Defendants provided no warning to physicians about the risks or increased risks specifically associated with the unique design of the Physiomesh.

49. The Defendants' Instructions for Use for the Physiomesh failed to adequately warn Plaintiff's physicians of numerous risks which Defendants knew or should have known were associated with the Physiomesh, including the risks of the product's inhibition of tissue incorporation, pain, immunologic response, dehiscence, encapsulation, rejection, migration, scarification, shrinkage/contraction, adhesion to internal organs and viscera, erosion through adjacent tissue and viscera, intestinal obstruction, failure of repair/hernia recurrence, hernia incarceration or strangulation, or deformation or rupture of the mesh.

50. Defendants failed to adequately train or warn Plaintiff or his physicians about the necessity for invasive surgical intervention in the event of complications, or how to properly treat such complications when they occurred.

51. Defendants failed to adequately train or warn Plaintiff or his physicians that the necessary surgical removal of the Physiomesh in the event of complications would leave the hernia unrepaired, and would necessitate further medical treatment to attempt to repair the same hernia that the failed Physiomesh was intended to treat.

52. Defendants represented to physicians, including Plaintiff's physician, that the multi-layer coating would prevent or reduce adhesion, and expressly intended for the Physiomesh to be implanted in contact with the intestines and internal organs and marketed and promoted the product for said purpose. Defendants failed to warn physicians that the multi-layer coating prevented tissue ingrowth, which is the desired biologic response to an implantable mesh device. Defendants failed to warn physicians that the multi-layer coating was only temporary and therefore at best would provide only a temporary adhesion barrier, and when the coating inevitably degraded, the exposed polypropylene would become adhered to the organs or tissue and would erode through adjacent tissue or organs.

53. With respect to the complications that were listed in the Defendants' warnings, Defendants provided no information or warning regarding the frequency, severity and duration of those complications, even though the complications associated with Physiomesh were more frequent, more severe and lasted longer than those with safer feasible alternative hernia repair treatments.

54. If Plaintiff and/or his physicians had been properly warned of the defects and dangers of Physiomesh, and of the frequency, severity and duration of the risks associated with the Physiomesh, Plaintiff would not have consented to allow the Physiomesh to be implanted in his body, and Plaintiff's physicians would not have implanted the Physiomesh in Plaintiff.

55. As a direct and proximate result of the inadequate and defective warnings and instructions, Plaintiff suffered injuries and damages as summarized herein.

## COUNT III
### Negligence

56. Plaintiffs incorporate herein by reference the allegations of paragraphs 12 through 55 as if fully set forth herein.

57. Defendants had a duty to use reasonable care in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, training, and preparing written instructions and warnings for Physiomesh, but failed to do so.

58. Defendants knew, or in the exercise of reasonable care should have known, that Physiomesh was defectively and unreasonably designed and/or manufactured, and was unreasonably dangerous and likely to injure patients in whom Physiomesh was implanted. Defendants knew or should have known that Plaintiff and Plaintiff's physicians were unaware of the dangers and defects inherent in the Physiomesh.

59. As a direct and proximate result of Defendants' negligence in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, training and preparing written instructions and warnings for Physiomesh, Plaintiffs suffered injuries and damages as summarized herein.

## COUNT IV
### Loss of Consortium

60. Plaintiffs incorporate herein by reference the allegations in paragraphs 12 through 59 as if fully set forth herein.

61. As a direct and proximate result of the above-described injuries sustained by Plaintiff Collin G. Ward, his wife, Peggy D. Ward, has suffered a loss of her husband's consortium, companionship, society, affection, services and support.

## COUNT V
### Punitive Damages

62. Plaintiffs incorporate herein by reference the allegations in paragraphs 12 through 61 as if fully set forth herein.

63. Defendants failed to adequately test and study the Physiomesh to determine and ensure that the product was safe and effective prior to releasing the product for sale for permanent human implantation, and Defendants continued to manufacture and sell Physiomesh after obtaining knowledge and information that the product was defective and unreasonably unsafe. Even though Defendants has other hernia repair mesh devices that do not present the same risks as the Physiomesh, Defendants developed, designed and sold Physiomesh, and continue to do so, because the Physiomesh has a significantly higher profit margin than other hernia repair products. Defendants were aware of the probable consequences of implantation of the dangerous and defective Physiomesh, including the risk of failure and serious injury, such as suffered by Plaintiff. Defendants willfully and recklessly failed to avoid those consequences, and in doing so, Defendants acted intentionally, maliciously and recklessly with regard the safety of those persons who might foreseeably have been harmed by the Physiomesh product, including Plaintiffs, justifying the imposition of punitive damages.

### Prayer for Relief

WHEREFORE, Plaintiffs demand judgment in their favor and seek the following relief against Defendants:

A. Compensatory damages in excess of $75,000, exclusive of interest and costs;

B. Costs of suit;

C. Pre-judgment and post-judgment interest;

D. Punitive damages; and

E. Such other relief as this Court deems just and proper under the circumstances.

### Jury Demand

Plaintiffs demand a trial by jury on all issues so triable.

_____
Lance W. Oliver, Esquire
Florida Bar Number: 96085
**MOTLEY RICE, LLC**
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Telephone Number: (843) 216-9000
Facsimile Number: (843) 216-9450
loliver@motleyrice.com

*Of Counsel*:

Donald Migliori, Esquire
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
dmigliori@motleyrice.com

-and-

Jonathan D. Orent, Esquire
Kate E. Menard, Esquire
**MOTLEY RICE, LLC**
55 Cedar St., STE 100
Providence, RI 02903
Telephone Number: 401-457-7765
Facsimile Number: 401-457-7708
kmenard@motleyrice.com
jorent@motleyrice.com