## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **JAMES PORTER and CHARMAINE PORTER,** | ) ) ) | **Civil Action No.:** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) ) | **JURY TRIAL DEMANDED** |
| **JOHNSON & JOHNSON and ETHICON, INC.,** | ) ) ) | |
| **Defendants.** | ) ) ) | |

## COMPLAINT

Come now Plaintiffs, James Porter and Charmaine Porter (Collectively, "Plaintiffs"; James Porter may be referred to individually as "Plaintiff"), by and through undersigned counsel, and bring this action against Defendants Ethicon, Inc. and Johnson & Johnson (hereinafter "Defendants"), and allege as follows:

### Parties

1.      Plaintiffs are, and were, at all relevant times, citizens and residents of Georgia and the United States.

2.      Defendant Johnson & Johnson ("J&J") is a corporation incorporated in New Jersey, and according to its website, the world's largest and most diverse medical device and diagnostics company, with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.  Defendant J&J is a citizen of New Jersey.

3.      Defendant J&J organizes its subsidiary businesses into individual Business Units to coordinate the development, manufacture, testing, marketing promotion, training, distribution and sale of its products, including but not limited to its hernia repair mesh products. Within J&J there are three sectors: medical devices and diagnostics, pharmaceutical, and consumer. Within the medical devices and diagnostic sector are "Business Units" including the "Ethicon Franchise." The Ethicon Franchise was charged by J&J with the design, development, promotion, marketing, testing, training, distribution and sale of the hernia repair mesh products at issue in this case. The Company Group Chairman and Worldwide Franchise Chairman for the Ethicon Franchise, Gary Pruden, is employed by J&J. The companies which comprise the Ethicon Franchise are thus controlled by J&J and include, but are not limited to, Ethicon Inc.

4.      Defendant Ethicon, Inc. ("Ethicon") is a wholly owned subsidiary of Defendant Johnson & Johnson.   Defendant Ethicon, Inc. is a corporation incorporated in the State of New Jersey with its principal place of business in Somerville, New Jersey.  Ethicon is a citizen of New Jersey.

5.      Ethicon is a medical device company involved in the research, development, testing, manufacture, production, marketing, promotion and/or sale of medical devices including Physiomesh (hereinafter may be referred to as the "product").

6.      J&J, directly and/or through the actions of Ethicon, Inc., has at all pertinent times been responsible for the research, development, testing, manufacture, production, marketing, promotion, distribution and/or sale of Physiomesh.

7.      Defendants are individually, jointly and severally liable to Plaintiffs for damages suffered by Plaintiff James Porter arising from the Defendants' design, manufacture, marketing, labeling, distribution, sale and placement of its defective mesh products at issue in the instant action, effectuated directly and indirectly through their respective agents, servants, employees

3

and/or owners, all acting within the course and scope of their representative agencies, services, employments and/or ownership.

8.     Defendants are vicariously liable for the acts and/or omissions of its employees and/or agents who were at all times relevant hereto acting on behalf of Defendants and within the scope of their employment or agency with Defendants.

## Jurisdiction and Venue

9.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between Plaintiff and all Defendants.  The amount in controversy exceeds $75,000, exclusive of interests and costs.

10.     Venue is proper in this Court pursuant to 28 U.S.C § 1407.

11.     Pursuant to MDL No. 2782 Practice and Procedure Order No. 2: Master Pleadings, Direct Filing; Short Form Complaints; Service of Process; Motions, Plaintiff is filing this case directly into this Court for inclusion in MDL No. 2782 *In re Ethicon Flexible Composite Hernia Mesh Products Liability Litigation* (August 22, 2017).

12.     Plaintiff respectfully requests at the time of transfer of this action back to the trial court for further proceedings, that this case be transferred to the District of Arizona.

13.     Venue in this case is proper in the District of Arizona pursuant to 28 U.S.C. § 1391(b)(2).

14.     The District of Arizona has personal jurisdiction over each of the Defendants pursuant to the Arizona Long-Arm Statute.  Defendants transact business within the State of Arizona, and Defendants committed tortious acts and omissions in Arizona.  Defendants' tortious acts and omissions caused injury to Plaintiff in Arizona.  Defendants have purposefully engaged in the business of developing, manufacturing, publishing information, marketing, distributing, promoting and/or selling, either directly or indirectly, medical devices including Physiomesh mesh products in Arizona, for which they derived significant and regular income.  Defendants reasonably expected that that their defective mesh products, including Physiomesh, would be used, consumed, sold and implanted in Arizona, and the Physiomesh products were regularly used, consumed, sold and implanted in Arizona.

## Facts Common To All Counts

5

1.      Plaintiff James Porter was implanted with a 20CM x 25CM Physiomesh (PHY2025V) device at JCL Deer Valley Hospital in Phoenix, Arizona on January 10, 2013.

2.      Defendants manufactured, sold, and/or distributed the Physiomesh device to Plaintiff, through her doctors, to be used for treatment of hernia repair.

3.      On or about September 21, 2015, Plaintiff underwent an invasive surgical procedure at Abrazo Arrowhead Campus in Glendale, Arizona to remove extensive bowel adhesions to the Physiomesh device implanted in his body, and to remove the device.  The initial Physiomesh device implanted in Plaintiff failed, and necessitated additional surgical repair of the same hernia it was implanted to treat.  Plaintiff was implanted with a 4 in. x 6 in. Physiomesh to repair the recurrent hernia that the initial Physiomesh implant failed to treat.

4.      On or about February 14, 2017, Plaintiff endured another invasive surgical procedure to remove the second Physiomesh implanted in his body, which ruptured and failed.

5.      Defendants were responsible for the research, design, development, testing, manufacture, production, marketing, promotion,

distribution and sale of Physiomesh, including providing the warnings and instructions concerning the product.

6.    Among the intended purposes for which Defendants designed, manufactured and sold Physiomesh was use by surgeons for hernia repair surgeries, the purpose for which the Physiomesh was implanted in Plaintiff James Porter.

7.    Defendants represented to Plaintiff and Plaintiff's physicians that Physiomesh was a safe and effective product for hernia repair.

8.    Defendants' Physiomesh was defectively designed and/or manufactured, was not reasonably safe for its intended use in hernia repair, and the risks of the design outweighed any potential benefits associated with the design. As a result of the defective design and/or manufacture of the Physiomesh, there was an unreasonable risk of severe adverse reactions to the mesh or mesh components including: chronic pain; recurrence of hernia; foreign body response; rejection; infection; inadequate or failure of incorporation/ingrowth; migration; scarification; deformation of mesh; improper wound healing; excessive and chronic inflammation; adhesions to internal organs; erosion; abscess; fistula

formation; granulomatous response; seroma formation; nerve damage; tissue damage and/or death; and other complications.

9.    Physiomesh has a unique design incorporating five (5) distinct layers: two layers of poliglecaprone-25 ("Monocryl") film covering two underlying layers of polydioxanone film ("PDS"), which in turn coat a polypropylene mesh.  This design is not used in any other hernia repair product sold in the United States.  The multi-layer coating was represented and promoted by the Defendants to prevent or minimize adhesion and inflammation and to facilitate incorporation of the mesh into the body, but it did not.  Instead, the multi-layer coating prevented adequate incorporation of the mesh into the body and caused or contributed to an intense inflammatory and chronic foreign body response resulting in an adverse tissue reaction including migration and damage to surrounding tissue in the form of sclerotic, granulomatous and/or fibrotic tissue and improper healing.

10.    When affixed to the body's tissue, the impermeable multi-layer coating of the Physiomesh prevents fluid escape, which leads to seroma formation, and which in turn can cause infection, abscess formation and other complications.

8

11.     The multi-layer coating provides a breeding ground for bacteria in which the bacteria cannot be eliminated by the body's immune response, which allows infection to proliferate.

12.     The multi-layer coating of Defendants' Physiomesh is cytotoxic, immunogenic, and not biocompatible, which causes or contributes to complications such as delayed wound healing, inflammation, foreign body response, rejection, infection, and other complications.

13.     Defendants knew or should have known of the cytotoxic and immunogenic properties of the multi-layer coating of the Physiomesh prior to introducing it into the stream of commerce.

14.     The polypropylene mesh portion of the Physiomesh was insufficient to withstand normal abdominal forces, which resulted in recurrent hernia formation and/or rupture and deformation of the mesh itself.

15.     When the multi-layer coating of the Physiomesh is disrupted and/or degrades, the "naked" polypropylene mesh is exposed to the adjoining tissue and viscera, and can become adhered to organs, and cause damage to organs, and potentiate fistula formation.

16.    In May 2016, Defendants issued an "Urgent: Field Safety Notice" relating to the Physiomesh product, the same product implanted in Plaintiff, and sent such notification to hospitals and medical providers in various countries worldwide.  In this Urgent Field Safety Notice, Defendants advise these providers of "a voluntary product recall," citing two international device registries which reported data reflecting recurrence/reoperation rates being higher than that observed from a data set relating to patient outcomes after being implanted with other mesh.  However, in the United States, Defendants failed to issue a nationwide recall, opting instead to simply remove the product from shelves and cease further sales within the United States.

17.    These manufacturing and design defects associated with the Physiomesh were directly and proximately related to the injuries suffered by Plaintiff James Porter.

18.    Neither Plaintiff James Porter nor his implanting physician were adequately warned or informed by Defendants of the defective and dangerous nature of Physiomesh. Moreover, neither Plaintiff James Porter nor his implanting physician were adequately warned or informed by Defendants of the risks

associated with the Physiomesh or the frequency, severity, or duration of such risks.

19.    The Physiomesh implanted in Plaintiff James Porter failed to reasonably perform as intended.  The mesh failed, caused serious injury and portions of the mesh had to be surgically removed via invasive surgery, and necessitated additional invasive surgery to repair the hernia that the Physiomesh was initially implanted to treat.

20.    Plaintiff James Porter's severe adverse reaction, and the necessity for surgical removal of the Physiomesh, directly and proximately resulted from the defective and dangerous condition of the product and Defendants' defective and inadequate warnings about the risks associated with the product, and the frequency, severity and duration of such risks.  Plaintiff James Porter has suffered, and will continue to suffer, both physical injury and pain and mental anguish, permanent and severe scarring and disfigurement, and has incurred substantial medical bills and other expenses, resulting from the defective and dangerous condition of the product and from Defendants' defective and inadequate warnings about the risks associated with the product.

## COUNT I
## Strict Product Liability: Defective Design

21.     Plaintiffs incorporate herein by reference the allegations in paragraphs 13 through 31 as if fully set forth herein.

22.     At the time the Physiomesh was implanted in Plaintiff James Porter's body, the product was defectively designed.  As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended, and Defendants failed to design against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

23.     Defendants expected and intended the Physiomesh product to reach users such as Plaintiff in the condition in which the product was sold.

24.     The implantation of Physiomesh in Plaintiff's body was medically reasonable, and was a type of use that Defendants intended and foresaw when it designed, manufactured and sold the product.

25.     The risks of the Physiomesh design significantly outweigh any benefits that Defendants contend could be associated with the product's design. The multi-layer coating, which is not used in any other hernia mesh product sold in the United States, prevents tissue from incorporating into the mesh, leading to encapsulation, deformation, scarification and contraction, migration, erosion and

rejection.  The impermeable multi-layer coating leads to seroma formation, and provides a breeding ground for infection, and protects bacteria from being eliminated by the body's natural immune response.

26.     The multi-layer coating of the Physiomesh, which was marketed, promoted and intended as a barrier against adhesion to the internal organs, was only temporary; it was expected and intended to degrade over time inside the body. Thus, this coating prevented tissue ingrowth in the short term, and degraded in the long-term, eventually leaving the "naked" polypropylene mesh exposed to the internal viscera and tissues.  The degradation of this multi-layer coating caused or exacerbated an intense inflammatory and foreign body reaction.  Once exposed to the viscera, the polypropylene mesh will inevitably adhere to the viscera, initiating a cascade of adverse consequences.  Any purported beneficial purpose of the multi-layer coating (to prevent adhesion to the internal viscera and organs) was non-existent; the product provided no benefit while substantially increasing the risks to the patient.

27.     The polypropylene mesh within the defective multi-layer coating of the Physiomesh was in itself dangerous and defective, particularly when used in the manner intended by Defendants in the Physiomesh.  When implanted adjacent

13

to the intestines and other internal organs, as Defendants intended for Physiomesh, polypropylene mesh is unreasonably susceptible to adhesion, bowel perforation or erosion, fistula formation and bowel strangulation or hernia incarceration, and other injuries.

28.     The polypropylene mesh used in the Physiomesh device was insufficient in strength to withstand the internal forces of the abdomen after implantation, which made the device susceptible to fracture and/or deformation, as occurred with the Physiomesh implanted in Mr. Porter.

29.     The appropriate treatment for complications associated with Physiomesh involves additional invasive surgery to remove the mesh from the body, thus eliminating any purported benefit that the mesh was intended to provide to the patient.

30.     Physiomesh was designed and intended for intraperitoneal implantation, which involved the product being implanted in contact with the intestines and/or other internal organs, which unnecessarily increased the risks of adhesion, erosion, fistula formation, and other injuries.

14

31.     At the time the Physiomesh was implanted in Plaintiff, there were safer feasible alternative designs for hernia mesh products that would have prevented the injuries he suffered.

32.     The Physiomesh product cost significantly more than competitive products because of its unique multi-layer coating, even though the multi-layer coating provided no benefit to consumers, and increased the risks to patients implanted with these devices.

33.     The Physiomesh implanted in Plaintiff failed to reasonably perform as intended, and had to be surgically removed necessitating further invasive surgery to repair the very issue that the product was intended to repair, and thus provided no benefit to him.

34.     As a direct and proximate result of the defective and unreasonably dangerous condition of the product, Plaintiff suffered injuries and damages as summarized herein.

## COUNT II
## Strict Product Liability: Failure to Warn

35.     Plaintiffs incorporate herein by reference the allegations in paragraphs 13 through 31 as if fully set forth herein.

36.     At the time the Physiomesh was implanted in Plaintiff's body, the warnings and instructions provided by Defendants for the Physiomesh were inadequate and defective. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended, and Defendants failed to design and/or manufacture against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

37.     Defendants expected and intended the Physiomesh product to reach users such as Plaintiff in the condition in which the product was sold.

38.     Plaintiff and his physicians were unaware of the defects and dangers of Physiomesh, and were unaware of the frequency, severity and duration of the defects and risks associated with the Physiomesh.

39.     The Defendants' Instructions for Use provided with the Physiomesh expressly understates and misstates the risks known to be associated specifically with the Physiomesh by stating that "Potential adverse reactions are those typically associated with surgically implantable materials." No other surgical mesh sold in the United States – and no other "surgically implantable material" – suffers the same serious design flaws as Physiomesh. No other device or material contains the

16

dangerous and defective multi-layer coating, which itself causes or increases the risks of numerous complications, including prevention of incorporation, increased risk of seroma formation, immunologic response, increased risk for infection, and increased inflammatory reaction and foreign body response.  Defendants provided no warning to physicians about the risks or increased risks specifically associated with the unique design of the Physiomesh.

40.    The Defendants' Instructions for Use for the Physiomesh failed to adequately warn Plaintiff's physicians of numerous risks which Defendants knew or should have known were associated with the Physiomesh, including the risks of the product's inhibition of tissue incorporation, pain, immunologic response, dehiscence, encapsulation, rejection, migration, scarification, shrinkage/contraction, adhesion to internal organs and viscera, erosion through adjacent tissue and viscera, intestinal obstruction, failure of repair/hernia recurrence, hernia incarceration or strangulation, or rupture/fracture of the mesh.

41.    Defendants failed to adequately train or warn Plaintiff or her physicians about the necessity for invasive surgical intervention in the event of complications, or how to properly treat such complications when they occurred.

17

42.    Defendants failed to adequately warn Plaintiff or her physicians that the necessary surgical removal of the Physiomesh in the event of complications would leave the hernia unrepaired, and would necessitate further medical treatment to attempt to repair the same hernia that the failed Physiomesh was intended to treat.

43.    Defendants represented to physicians, including Plaintiff's physician, that the multi-layer coating would prevent or reduce adhesion, and expressly intended for the Physiomesh to be implanted in contact with the intestines and internal organs and marketed and promoted the product for said purpose. Defendants failed to warn physicians that the multi-layer coating prevented tissue ingrowth, which is the desired biologic response to an implantable mesh device. Defendants failed to warn physicians that the multi-layer coating was only temporary and therefore at best would provide only a temporary adhesion barrier, and when the coating inevitably degraded, the exposed polypropylene would become adhered to the organs or tissue.

44.    With respect to the complications that were listed in the Defendants' warnings, Defendants provided no information or warning regarding the frequency, severity and duration of those complications, even though the complications

18

associated with Physiomesh were more frequent, more severe and lasted longer than those with safer feasible alternative hernia repair treatments.

45.     If Plaintiff and/or his physicians had been properly warned of the defects and dangers of Physiomesh, and of the frequency, severity and duration of the risks associated with the Physiomesh, Plaintiff would not have consented to allow the Physiomesh to be implanted in his body, and Plaintiff physicians would not have implanted the Physiomesh in Plaintiff.

46.     As a direct and proximate result of the inadequate and defective warnings and instructions, Plaintiff suffered injuries and damages as summarized herein.

## COUNT III
## Negligence

47.     Plaintiffs incorporate herein by reference the allegations of paragraphs 13 through 31 as if fully set forth herein.

48.     Defendants had a duty to use reasonable care in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, training, and preparing written instructions and warnings for Physiomesh, but failed to do so.

49.     Defendants knew, or in the exercise of reasonable care should have known, that Physiomesh was defectively and unreasonably designed and/or manufactured, and was unreasonably dangerous and likely to injure patients in whom Physiomesh was implanted.  Defendants knew or should have known that Plaintiff and Plaintiff's physicians were unaware of the dangers and defects inherent in the Physiomesh.

50.     As a direct and proximate result of Defendants' negligence in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, training and preparing written instructions and warnings for Physiomesh, Plaintiffs suffered injuries and damages as summarized herein.

**COUNT IV**
**Loss of Consortium**

51.     Plaintiffs incorporate herein by reference the allegations in paragraphs 13 through 31 as if fully set forth herein.

52.     As a direct and proximate result of the above-described injuries sustained by Plaintiff James Porter, his wife, Plaintiff Charmaine Porter, has suffered a loss of her husband's consortium, companionship, society, affection, services and support.

## Count V
## Punitive Damages

53.     Plaintiffs incorporate herein by reference the allegations in paragraphs 13 through 31 as if fully set forth herein.

54.     Defendants failed to adequately test and study the Physiomesh to determine and ensure that the product was safe and effective prior to releasing the product for sale for permanent human implantation, and Defendants continued to manufacture and sell Physiomesh after obtaining knowledge and information that the product was defective and unreasonably unsafe.  Even though Defendants have other hernia repair mesh devices that do not present the same risks as the Physiomesh, Defendants developed, designed and sold Physiomesh, because the Physiomesh has a significantly higher profit margin than other hernia repair products.  Defendants were aware of the probable consequences of implantation of the dangerous and defective Physiomesh, including the risk of failure and serious injury, such as suffered by Plaintiff. Defendants willfully and recklessly failed to avoid those consequences, and in doing so, Defendants acted intentionally, maliciously and recklessly with regard to the safety of those persons who might foreseeably have been harmed by the Physiomesh product, including Plaintiffs, justifying the imposition of punitive damages.

WHEREFORE, as a result of the acts and omissions and conduct of Defendants set forth herein, Plaintiff James Porter is entitled to recover for his personal injuries; past, present, and future medical and related expenses; and past, present and future mental and physical pain and suffering; and Plaintiff Charmaine Porter is entitled to recover for loss of consortium and services; Plaintiffs should be awarded punitive damages; and Plaintiffs should recover any other relief, monetary or equitable, to which they are entitled.

Plaintiffs demand trial by jury, judgment against Defendants, jointly and severally, for compensatory and punitive damages in an amount not less than $75,000, as well as costs, attorney fees, interest, and any other relief, monetary or equitable, to which they are entitled.

By:   */s/ Henry G. Garrard, III*
Henry G. Garrard, III
hgg@bbgbalaw.com
Georgia Bar No. 286300
James B. Matthews, III
jbm@bbgbalaw.com
Georgia Bar No. 477559
Andrew J. Hill, III
ajh@bbgbalaw.com
Georgia Bar No. 353300
Josh B. Wages
jbw@bbgbalaw.com
Georgia Bar No. 730098
Patrick H. Garrard

Georgia Bar No. 134007
phg@bbgbalaw.com
Counsel for the Plaintiffs

Blasingame, Burch, Garrard & Ashley, P.C.
P.O. Box 832
Athens, GA  30603
(706) 354-4000

## <u>FONT CERTIFICATION</u>

Pursuant to Local Rule 7.1 D, I hereby certify that foregoing document was

prepared using Times New Roman 14 point type as provided in Local Rule 5.1.

*<u>/s/ Henry G. Garrard, III</u>*
Henry G. Garrard, III
Georgia Bar No. 286300
