## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **IN RE: ETHICON PHYSIOMESH FLEXIBLE COMPOSITE HERNIA MESH PRODUCTS LIABILITY LITIGATION** | **MDL DOCKET NO. 2782** <br><br> **CIVIL ACTION NO.** <br><br> **1:17-md-02782-RWS** |
| **THIS DOCUMENT RELATES TO ALL CASES** | |

## ORDER REGARDING PLAINTIFFS' PETITION FOR AN AWARD AND ALLOCATION OF COMMON BENEFIT ATTORNEYS' FEES AND EXPENSES, AND MEMORANDUM IN SUPPORT

THIS MATTER comes before the Court on Plaintiffs' Petition for an Award and Allocation of Common Benefit Attorneys' Fees and Expenses, and Memorandum in Support. Having considered the matter, the Court finds that the Petition should be GRANTED for the reasons set forth below.

Since the Judicial Panel for Multidistrict Litigation assigned this MDL to this Court in 2017, this Court has overseen all aspects of this MDL. Having handled this litigation from its inception, this Court heard and decided volumes of motions and discovery disputes, presided over regular hearings and status conferences, as well as the pre-trial work-up of multiple trial pool cases. This Court has issued multiple written opinions during this litigation providing guidance on a variety of procedural,

1

legal and evidentiary issues.  This Court has been apprised of the status of settlement negotiations of a global settlement to include both the MDL cases as well as those pending in the related New Jersey State Court Physiomesh MCL proceeding.  In short, this Court has gained familiarity with the factual and legal issues involved in the cases that comprise this litigation, as well as with counsel for the parties. The Court's experience in presiding over this litigation provides the Court with unique insight into the nature and quality of the work that was performed by the lawyers and law firms before this Court.  See, *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 2017 WL 3033134, *34 (W.D. La. 2017) (MDL Court noting in the context of common benefit fee award and allocation order its "unique position" of having followed the work of the Common Benefit Counsel and "having had hands-on involvement from the beginning"); *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (recognizing that district courts commonly have an intimate understanding of the cases over which they preside and are well-suited to assess pertinent factual matters related to the conduct of litigation before them).

The Agreed Order Regarding Cost Reimbursement and Related Common Benefit Issues (Practice and Procedure Order No. 23), hereinafter the "Common Benefit Order," establishes a Common Benefit Fund based on an assessment of all settlements or judgments by Defendants in the amount of nine percent (9%) for attorneys' fees and one percent (1%) for expenses.  The Common Benefit Order

2

notes that members of the Court-appointed Plaintiffs' Steering Committee ("PSC") have paid assessments and that Plaintiffs' Co-Lead Counsel and some PSC firms have made payment of certain common benefit expenses.

The Common Benefit Order was intended to provide guidance so that, should the issue become ripe, any attorneys applying for common benefit fees or expenses will have notice of the standards to be employed in assessing those applications.   The Common Benefit Order provides that "[u]pon order of the Court, payments may be made from the Common Benefit Fund to attorneys who provide, or have provided, services or incur, or have incurred, expenses for the joint and common benefit of plaintiffs in addition to their own client(s)."  The order defines who is eligible to apply for common benefit reimbursement, and that all authorized counsel "consent[] and agree[] to be bound by this Order."

Guidelines for the submission of time and expenses for consideration as common benefit compensation or reimbursement, and what type of activities and expenses are generally considered for the common benefit, are set forth in Section 4 of the Common Benefit Order.  Under the Common Benefit Order, Plaintiffs' Co-Lead Counsel have the primary responsibility and discretion to determine the

extent to which the factors identified in the order have been met by any counsel seeking fees, subject to the Court's review and approval.[1]

Based on the Court's experience and familiarity with this litigation, the Court observes that the procedural history recounted in Co-Lead Counsel's Petition for an Award and Allocation of Common Benefit Attorneys' Fees and Expenses provides an accurate overview of the history of this litigation before this Court. Therefore, the Court will recite much of what the Co-Lead Counsel have set forth in their Petition in terms of the common benefit work that has been performed and the expenses incurred in the prosecution of this litigation.

## I. PROCEDURAL HISTORY OF PHYSIOMESH LITIGATION BEFORE THIS COURT

The design and development of the Physiomesh device occurred largely in Ethicon's German facilities and was led by Ethicon's German Research & Development personnel. Physiomesh has a unique design incorporating five (5) distinct layers: two layers of polyglecaprone-25 ("Monocryl") film covering two underlying layers of polydioxanone film ("PDS"), which in turn coat a polypropylene mesh.

---

[1] The order states that in order to be eligible for compensation or reimbursement, the time expended, expenses incurred and activity in question must be (a) beneficial to the prosecution of the MDL; (b) authorized in writing in advance by Co-Lead Counsel; (c) timely submitted as requested by Plaintiffs' Co-Lead Counsel; (d) reasonable; and (e) non-duplicative.

As Physiomesh cases began to be filed in various federal courts throughout the country, the firms involved in the leadership of the litigation decided to request the JPML to coordinate the Physiomesh cases before a single federal district court pursuant to 28 U.S.C. § 1407.   The JPML held that the presence of common fact issues shared in these cases supported centralization of the Physiomesh cases before the same court.

The Plaintiffs' lawyers involved in the litigation from the outset assembled a Plaintiffs' Steering Committee ("PSC") of twelve attorneys from law firms across the country, who were ultimately appointed and assigned by the Court the responsibility of marshaling resources and leading this litigation under a unified leadership structure.   The Plaintiffs' leadership has devoted significant time, effort and expense to pursuing and developing multiple legal theories against a unique product designed and developed in Europe.

The defendants in these MDLs – Johnson & Johnson and its subsidiary, Ethicon, Inc. – are among the largest medical device manufacturers in the world, and they have been well-defended in this litigation by experienced medical device defense law firms, including Butler Snow, Troutman Sanders and Skadden.   The PSC firms contributed a total of $1,100,000 in common benefit assessments, which were used to fund the litigation generally.  "Held costs" in the amount of $3,120,861.96 have been incurred to date for the common benefit.   Plaintiffs'

leadership advises that these costs continue to be incurred in conjunction with the global settlement process and these additional costs remain as held costs.

Plaintiffs' leadership prepared Master Pleadings, Plaintiff Profile Forms and Plaintiff Fact Sheets, and negotiated and drafted a series of procedural and scheduling orders to move the litigation forward.  Plaintiffs' leadership also negotiated and drafted the protocols and orders to guide discovery, including Electronically-Stored Information protocols and search parameters, plaintiff and defendant fact sheets/profile forms, joint records collection, translation protocols, protective orders, and procedures for the collection and preservation of pathology.

Plaintiffs' leadership established and funded the shared electronic document depository (DISCO) where all defense-produced documents and other important materials were made accessible to all MDL plaintiffs' counsel in searchable format. Plaintiffs' leadership identified the important issues in these cases and created "issue codes" for purposes of document review, and documents were reviewed and "coded" according to their relevance. Plaintiffs' leadership reviewed and analyzed Defendants' discovery responses and objections and handled disputes regarding confidentiality, privilege and work product claims by the defense, typically by way of informal meet and confer, but occasionally necessitating motions practice before the Court. Other discovery disputes necessitated meet and confers with defense

counsel, discovery conferences with the Court, and various motions that were typically handled by letter brief.

Over the course of this MDL, Defendants produced 4,008,567 documents from 846 different custodians or non-custodial sources. Plaintiffs' leadership was responsible for the oversight and coordination of the review of these documents and for culling the documents that were used in expert preparation and the preparation of cases for trial, and identification of important documents for use by other attorneys with cases in the MDL. Many of these documents were in a foreign language and had to be translated merely in order to be reviewed.

Plaintiffs' leadership took depositions of a variety of former and current employees of the Defendants, including representatives from sales and marketing, regulatory, post-market surveillance, research and development/product design, risk management, as well as managerial and executive employees. More than seventeen individual and 30(b)(6) corporate depositions were eventually taken of the Defendants in this MDL, with most of those depositions occurring over multiple days.

Plaintiffs' leadership also identified general experts from a variety of scientific fields, including pathology and biomaterials, and surgeon experts who had the requisite background and experience to testify about causation and Defendants' mesh design and warnings.

Developing the liability case against a uniquely-designed medical device used by medical professionals required knowledge of the applicable anatomy, medicine, and the scientific principles and literature applicable to synthetic surgical mesh devices.  Plaintiffs' leadership developed and presented expert reports addressing the important scientific product defect principles, which again were unique in light of the unique design of Physiomesh.

Several of Defendants' current and former employees and one of Plaintiffs' general experts, Dr. Bernd Klosterhalfen, are in Europe, which involved additional expense and effort as a result of travel, translation and compliance with foreign applicable law regarding discovery.

Plaintiffs' leadership identified and served Rule 26 Reports for nine general and case-specific experts.  Defendants also had their own teams of experts, and Plaintiffs' leadership was responsible for preparing for and taking their depositions. The defense identified twenty general and case-specific experts in this MDL, and nearly all of them were deposed by Plaintiffs' leadership. Many of the defense experts issued voluminous reports, citing to volumes of scientific testing and clinical and animal study results, all of which had to be reviewed and analyzed by Plaintiffs' leadership, and ultimately addressed by way of cross-examination, *Daubert* motions and testimony from Plaintiffs' experts.

The bellwether trial process per the Court's Case Management Orders involved preparation of multiple trial pool cases for trial, which process was handled and overseen by Plaintiffs' leadership. The trial pool selection cases were ultimately resolved prior to trial, but only after all of the extensive pre-trial work had been done and the cases were ready for trial. Each trial pool case involved rounds of motions and briefing on procedural and substantive legal issues, *in limine* arguments over the evidence to be offered at trial and a variety of other pre-trial issues.

During the course of the MDL, volumes of pre-trial motions were argued and decided and orders were issued by the Court pursuant to the laws of different states, including: *Daubert* motions against nearly every expert; summary judgment motions on issues relating to design defect, warnings sufficiency, the learned intermediary doctrine, general causation and specific causation; and numerous motions *in limine* seeking to limit or exclude evidence. Plaintiffs' leadership handled the *Daubert* and dispositive responsive briefing, and Plaintiffs' motions *in limine*. Important legal issues regarding limitations on expert communications and consolidation of multiple MDL plaintiffs for purposes of trial pursuant to Rule 42 were briefed and argued by leadership. Plaintiffs' leadership also handled the briefing regarding the exclusion of evidence regarding the FDA 510(k) clearance process. Plaintiffs' leadership also prepared the briefing regarding the admissibility of important product-related evidence used by all Plaintiffs.

Plaintiffs' leadership also coordinated efforts with attorneys who were handling related litigation involving Physiomesh against these same defendants in the New Jersey state court.

Plaintiffs' leadership was also responsible for negotiating and ultimately achieving the global settlement of all MDL cases and the New Jersey state court Physiomesh cases. After nearly three years of negotiations, a Term Sheet outlining the basic terms of a global settlement for the 3,600 cases filed in the MDL and additionally the Physiomesh cases filed in the New Jersey state court litigation, was entered into on May 13, 2021. Because the amount of the global settlement is confidential, those amounts were redacted from the Plaintiffs' publicly-filed Petition. However, the Court has been provided with the unredacted Petition and the Court is aware of the confidential total amount of the settlement. The Court is also advised that all counsel for Plaintiffs who are eligible for participation in the global settlement have been provided the total value of the global settlement and the number of participants in the global settlement in writing.

Plaintiffs' leadership coordinated efforts to conduct "censuses" of thousands of MDL cases in order to inform the parties of the range of injuries involved. Plaintiff's leadership was responsible for having the various firms input data into an electronic repository established by Plaintiffs' leadership and overseeing this process. This case data was assimilated and evaluated by nurses employed by

Plaintiffs' leadership and Plaintiffs' leadership engaged a Special Master to assign values to individual cases and to oversee the appeals process, as well as a lien resolution firm to resolve liens asserted in cases, as necessary.

Plaintiffs' leadership sought and obtained the creation of a Qualified Settlement Fund by Order of this Court, gathered the information necessary to deliver payment of settlement funds to each plaintiff's firm with a settling case, and Plaintiffs' leadership continues to work with plaintiffs' counsel to address issues associated with plaintiffs' bankruptcies, decedents' estates and benefits planning trusts.  Plaintiffs' leadership also assumed the responsibility of reviewing all releases as they have been submitted in order to attempt to facilitate clearing up any deficiencies in any individual releases.

For MDL cases filed subsequent to the cutoff date for participation in the global settlement (May 13, 2021), Plaintiffs' leadership is starting the process of attempting to negotiate a resolution of those additional cases. There are also 132 cases that are on a substitute list that may potentially be used to replace cases among the 3,600 that do not qualify for or join the settlement for whatever reason. If any of those cases are not used a replacement in the settlement, Plaintiffs' leadership intends to negotiate a resolution of those cases.

In sum, the process of arriving at a global settlement in this MDL and of the related New Jersey State Court litigation and facilitating the accomplishment of the

deal and the terms of the Master Settlement agreement has been difficult and time-consuming, and that work is on-going.

Through the date of this motion, the common benefit law firms submitted 50,993.25 hours of time for common benefit consideration in this MDL. Significant common benefit work continues, at this time primarily related to the administration and management of the on-going global settlement process.

## II. FINDINGS OF FACT

The Court makes the following findings of fact with regard to the FCC's Petition:

1. The Common Benefit Order required that 9% of each individual settlement or judgment be paid into a common benefit fund to be used for payment of court-approved attorneys' fees incurred for the common benefit of all claimants and that 1% be paid into the fund for reimbursement of common expenses. The Court received no objection to the Holdback Order.

2. The global settlement ultimately negotiated and achieved in this MDL and the related New Jersey state court Physiomesh litigation resulted from the efforts of a group of counsel ("Common Benefit Counsel"), whose work for the common benefit of all claimants included an extensive investigation of the facts, fact discovery, the retention of numerous expert witnesses across a number of complex subjects who provided in-depth analyses and reports, motion and briefing practice, and the preparation of multiple cases for trials.

3. Plaintiffs' Co-Lead Counsel seek an award consistent with the Court's prior Common Benefit Order of 9% of the amount of any settlement or judgments to be paid from the MDL fund for fees and 1% for reimbursement of common expenses. Because the amount of expenses incurred to date already exceeds the 1% holdback ordered in the Common Benefit Order, Plaintiffs' Co-Lead Counsel also request that the Court order that any excess expenses be paid from the 9% attorneys' fee award, rather than increasing the amount of the expense award.

4. Plaintiffs' Co-Lead Counsel's Petition also seeks an order allocating the

common benefit expenses and fees that may be awarded by the Court and allowing the distribution of those fees and expenses to counsel who have sought common benefit reimbursement and/or compensation.  The Court is well aware of the work by Plaintiffs' leadership as it has overseen this litigation from its inception.  The work that Common Benefit Counsel performed, and on which Co-Lead Counsel's request is based, is described in full detail in the Co-Lead Counsel's Petition for an Award and Allocation of Common Benefit Attorneys' Fees and Expenses, which is summarized above, and which discussion is incorporated by reference herein.

## III. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

In multidistrict litigation, the court's authority to award common benefit fees and expenses to counsel who provided work beneficial to all plaintiffs from the recoveries of all plaintiffs is well-established. *See*, *In re Genetically Modified Rice Litig.*, 835 F.3d 822, 828 (8th Cir.2016) ("No party challenges the propriety of the Common Benefit Order or the 'well established' authority of a district court to compensate leadership lawyers by ordering funds to be set aside from recoveries obtained by other plaintiffs in multidistrict litigation."). Such an award is supported by the common fund doctrine, equity, quantum meruit, as well as broad managerial authority afforded an MDL Court. *In re Vioxx Prods. Liab. Litig.*, 760 F.Supp.2d 640, 647-48 (E.D.La.2010). The Court's inherent managerial authority necessarily includes the power to provide a means of compensation for services provided by members of the Common Benefit Counsel who provided common benefit work separate and apart from their fee agreements with their respective clients. *See*, *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1016 (5th Cir. 1977) ("[I]f lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation…. The interests to be served are too important to be left to volunteers (or draftees) who are unpaid in the sense that they get nothing

additional."); *In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 129-130 (2nd Cir.2010) ("[The desirability—indeed, the compelling need—to have pretrial proceedings managed or at least coordinated by lead counsel or a steering or executive committee demands the existence of a source of compensation for their efforts on behalf of all. The logical, and a most equitable, source of that compensation is recoveries of individual plaintiffs who benefit from that work. Indeed, foreclosing those recoveries as a source of funding for the common benefit work would enrich the non-contributing individual plaintiffs unjustly at the expense of either or both of the lead counsel and any contributing individual plaintiffs.").

Under Eleventh Circuit precedent, an attorney's fee award "shall be based upon a reasonable percentage of the fund established for the benefit of the class." *In re Equifax, Inc. Customer Data Security Breach Litig.*, 999 F.3d 1247, 1278 (11th Cir. 2021) (citing *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991)). Under the percentage method, the court awards attorney's fees as a reasonable percentage of the common fund to compensate attorneys who recovered an identifiable sum by awarding them a reasonable fraction of that sum. *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 650 (E.D. La. 2010). While such is not required in the Eleventh Circuit, courts also sometimes apply a rough lodestar "cross-check" to assess the reasonableness of the percentage-based fee. *In re Equifax, supra* at 1278 ("[W]hile noting it was not required to do so, the District

Court also used the 'lodestar method' as a 'cross-check on the reasonableness of a percentage-based fee.'...."). This methodology – percentage fee with a rough lodestar analysis as a cross-check – has likewise been employed in MDL mass tort product liability actions. *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 2017 WL 3033134, *26 (W.D. La. 2017) ("Virtually all of the recent common fund fee awards in district courts in the Fifth Circuit – whether MDL or class action – have used the percentage method, with an overlay analysis of reasonableness...."); *In re Nuvaring Prods. Liab. Litig.*, 2014 WL 7271959, *2 (E.D. Mo. 2014) (noting "well-established" use of percentage method to determine attorney's fees in common fund case, and that "courts may then choose to use the lodestar method to cross-check the fairness of a percentage of the fund award."); *In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.*, 2012 WL 6923367, *2 (E.D. Pa. 2012) ("In common fund cases, attorneys' fees typically are awarded as a percentage of the fund, and an abbreviated lodestar cross-check is used to assess the reasonableness of the proposed fee.").

In the Eleventh Circuit, the percentage method requires a district court to consider a number of relevant factors called "the *Johnson* factors" in order to determine if the requested percentage is reasonable. *In re Equifax*, *supra* at 1278 (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).

**(1) The Value of the Benefits of the Settlement and the Degree of Success Obtained (*Johnson* factor 8).**

16

As recognized in *Deepwater Horizon*, 2016 WL 6215974 at *18, "the most critical factor in determining the reasonableness of a fee award is the degree of the success obtained," and "[s]uccess is determined not only by the gross amount of the recovery but also by the number of individuals who benefit from the class settlement, the degree to which it provides them with full compensation for their injuries, and the extent to which the settlement benefits the public at large." (*citing*, *inter alia*, *Vioxx*, 760 F. Supp. 2d at 657-68; *In re Diet Drugs Prods. Liab. Litig.*, 553 F.Supp.2d 442, 472-73 (E.D.Pa.2008), *aff'd*, 582 F.3d 524 (3rd Cir.2009)). *Accord Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). The value of a settlement fund includes all monetary amounts actually paid (or irrevocably deposited into a fund for payment) to or for the benefit of plaintiffs in the litigation. *Vioxx*, 760 F. Supp.2d at 652. Here, the current total value of all settlements subject to the common benefit assessment is confidential and has been provided to the Court under seal, and this amount has likewise been provided to counsel with Plaintiffs eligible for participation in the global settlement.  This confidential amount includes the resolution of up to 3,600 individual claims – including the MDL plaintiffs and plaintiffs in the related New Jersey state court MCL at the time the settlement was reached.

Where, as here, the settlement may involve payments over a period beyond the point the common benefit fee is determined, the settlement fund also includes a

"reasonable estimate" of the amount of future payments that are expected to be made to the plaintiffs. *Deepwater Horizon*, *supra* at *15 ("Where the settlement provides benefits on a 'pay-as-you-go' basis over a period beyond the point that a common benefit fee is to be awarded, the settlement fund also includes a reasonable estimate of the amount of future payments that will be made to claiming class members."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 334 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999) (the percentage method requires court to make a "reasonable estimate" of settlement value to be received in future). *Accord Weiss v. Mercedes-Benz of N.Am., Inc.*, 899 F. Supp. 1297, 1304 (D.N.J. 1995) (addressing future and contingent payments in analyzing amount of settlement recovered in analyzing attorney's fees request). Based upon the number of cases that will be resolved pursuant to a master settlement agreement and recently-filed cases remaining in the litigation that have not yet become part of any settlement agreement, and in light of the value of the master settlement agreement, the Plaintiffs' leadership has provided their reasonable expectation of the final total value of all settlements and judgments to the Court under seal.

The *Manual for Complex Litigation* (Fourth), § 20.132 (2004), states that "[a]s a transferee judge, it is advisable to make the most of this opportunity [where all cases, parties and counsel are before the same court] and facilitate the settlement of the federal and any related state cases." For years, this Court worked directly with

the parties in this litigation and their representative counsel to facilitate the potential for resolution in cases before this Court. This Court is well aware of the nature and quality of the work that was required by Plaintiffs' leadership to work up multiple cases for trial and to ultimately negotiate and achieve a global settlement in this hard-fought litigation. The Court is familiar with the complicated factual and legal issues involved in these complex cases that comprise this litigation, and which would impact the value of any individual case.

The Court finds that the coordinated efforts by Common Benefit Counsel helped to level the playing field and reduce the bargaining power otherwise enjoyed by the Defendants. For the benefit of all plaintiffs, Common Benefit Counsel helped administer the MDL by establishing uniform procedures and protocols intended to promote efficiency and economy and has been a repository for information to assist all plaintiffs' counsel. Common Benefit Counsel secured many important discovery, evidentiary and substantive rulings that apply on a litigation-wide basis. In the absence of MDL leadership's efforts over the past several years to continue developing cases for trial, to defeat dispositive motions, and to win important pretrial victories for plaintiffs, the willingness of any of these defendants to pursue a global settlement strategy would have been negatively impacted. The overall coordination and collaboration by Common Benefit Counsel in the MDL, which provided all plaintiffs access to the same medical, scientific and legal expertise, influenced these

defendants' decision to invest in settlement of the cases in this MDL and in the related New Jersey State Court Physiomesh litigation.

The value of the benefit provided to the clients in this litigation is substantial and supports an award of the previously-ordered holdback amount of 9% as compensation for fees.

**(2) Examination of Awards for Common Benefit Work in Comparable Cases and the Benchmark Percentage.**

As noted in *In re Vioxx*, *supra* at 654-55, "a reasonable common benefit assessment or award can vary from MDL to MDL…There is no mathematical formula for deriving a 'correct' amount," and agreeing with plaintiffs' leadership there that "a reasonable benchmark percentage is a flexible concept."  In light of the *Johnson* factors, discussed above and below, the 9% holdback previously ordered by the Court is reasonable and is well within the benchmark percentages for fee awards in comparable cases. In fact, as discussed below, this holdback percentage is decidedly on the low end of the range of percentage awards in similar litigations.

In *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2020 WL 1433923 (E.D.La. 2020), Judge Fallon entered a common benefit award of 12% in a product liability MDL settlement totaling $775,000,000, citing to a study by Theodore Eisenberg and Geoffrey Miller entitled *Attorney Fees in Class Action Settlements: An Empirical Study* and observing as follows:

This recovery falls within the "greater than 90%" decile of client

recovery in the study, which includes all recoveries greater than $190 million. *Id.* at 73. The data suggests that the mean fee percentage in such cases is 12 percent with a standard deviation of 8.1 percent. *Id.* Further, "fee requests falling within one standard deviation above or below the mean should be viewed as generally reasonable and approved by the court unless reasons are shown to question the fee." *Id.* at 74. In other words, **a fee falling between 4 percent (approximately one standard deviation below) and 20 percent (approximately one standard deviation above) is considered reasonable under this metric**.

(Emphasis added).

Applying a similar analysis in *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 424 F.Supp.3d 456, 499-500 (E.D.La. 2020), Judge Fallon entered an award of 19% based on a settlement of $248 million (the "Taishan Settlement") and noted that a prior settlement had been entered for another portion of that same MDL in the amount of roughly $233 million with attorney's fees of 17.7% (the "Knauf Settlement").

Similarly, in *In re National Football League Players Concussion Injury Litig.*, 2018 WL 1635648 (E.D.Pa. 2018), the MDL court entered an order awarding attorney's fees of 11% in a settlement involving a fund with a present value of $982.2 million, citing a study provided by plaintiffs' counsel in that case showing that "the average fee award for class settlements is 13.7% nationwide with a median of 9.5%." (citing Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, J. Empirical Legal Studies, Vol. 7, Issue 4, pp. 811-846 (Dec. 2010)). In *In re Oral Sodium Phosphate Solution-Based Products Liability Action*,

2010 WL 5058454 at *2, n. 10 (N.D. Ohio 2010), the MDL court observed that a survey of common benefit fee awards entered in state and federal court in 1,120 common fund cases found percentages of the total recovery for common benefit awards average 18.4% across all 1,120 cases; 15.1% across the 64 cases where recovery exceeded $100 million; and 16.1% across 10 mass tort cases (citing Stuart J. Logan, Dr. Jack Moshman, & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Reports (March–April 2003)).

Analysis of other common benefit awards in similar product liability MDLs and other litigations involving similar-sized settlements to the global settlement achieved here further underscores the reasonableness of a 9% fee award in this MDL. *See, In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 2019 WL 7859557 (N.D.Fla. 2019) (9% common benefit award in products liability MDL involving settlement of approximately $210,467,000);[2] *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2008 WL 682174, *6 (D. Minn. 2008) (award of 15% common benefit attorney's fees in MDL involving settlement amount of $230,000,000.00 despite only 18 months of litigation); *In re Nuvaring Prods. Liab. Litig.*, 2014 WL 7271959, *3 (E.D. Mo. 2014) (11% attorney fee holdback out of $100 million

---

[2] The Special Master's Recommendation, which is set forth in 2019 WL 7859557, was adopted and approved by the MDL court in *In re Abilify*. N.D.Fla. Case No. 3:16-md-2734, Dkt. No. 1230 (12/21/19) (Order adopting and approving recommendation regarding fee and expense award).

settlement was "very reasonable" in light of the work performed and result obtained, and "well within the percentages that courts have routinely awarded in similar cases."); *In re Equifax, Inc. Customer Data Security Breach Litig.*, 999 F.3d 1247 (11th Cir. 2021) (Eleventh Circuit approving Judge Thrash's attorney's fee award of 20.36% in case involving $380.5 million common fund); *In re Orthopedic Bone Screw Products Liability Litigation,* 2000 WL 1622741, *32 (E.D.Pa. 2000) (a 12% common benefit fee award from a $100 million total settlement fund in a nationwide medical device class action settlement found to be "modest, reasonable and in line with awards received in similar cases."); *Turner v. Murphy Oil USA, Inc.,* 472 F.Supp.2d 830, 864–67 (E.D.La.2007) (class action for damages arising from Hurricane Katrina) (attorneys' fees award in the amount of 17% of the $195 million common fund obtained); *In re Fresenius Granuflo/Naturalyte Dialysate Prods. Liab. Litig.*, 2017 WL 9324341 (D.Mass. 2017) (noting prior order of 11% common benefit assessment in case involving $250 million gross settlement); *In re Serzone Prods. Liab. Litig.*, 2007 WL 7701901, *3 (S.D.W. Va. 2007) (MDL court examined size of percentage fee awards in several mass tort drug and device litigations in relation to amount of benefit procured and amount of time invested by counsel ranging from 4.2% to 16% (average of 10.94%) and awarding 14.5% fee).  Here, the 9% attorney fee award falls below the mean fee percentage recognized in cases nationwide and squarely within the range of comparable settlements.

**(3) Analysis of the Reasonableness of the Percentage Based Upon the remaining *Johnson* Factors.**

After a percentage fee is determined to be comparable to benchmark percentage awards in similar litigations, the percentage is examined in light of the twelve *Johnson* factors: (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill required to properly perform the necessary legal services; (4) the preclusion of other employment by the attorneys due to acceptance of this case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the circumstances; (8) the amount involved and the result achieved;[3] (9) the experience, reputation and ability of common benefit counsel; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) fee awards in similar cases.

### a. <u>Time and Labor Required (Factor 1); Attorneys' Opportunity Costs In Pressing Litigation (Factor 4); Time Limitations Imposed by the Circumstances (Factor 7)</u>

The time and labor required to move this litigation forward is reflected in the number of Common Benefit hours that have been submitted by Common Benefit Counsel, 50,993.25 total hours. However, Plaintiffs' leadership's work continues, primarily the responsibility of managing and administering the global settlement

---

[3] *Johnson* factor No. 8 ("the amount involved and the result achieved") is addressed above.

process and to bring all 3,600 MDL cases and related New Jersey State Court Physiomesh cases to a resolution. *See*, *In re Nuvaring Prods. Liab. Litig.*, 2014 WL 7271959, *3 (E.D. Mo.2014) ("Co–Lead Counsel...continue to work for the benefit of all plaintiffs and claimants to administer the settlement program and to perform all necessary duties to conclude this MDL."). By comparison, for example, the attorneys in the *NFL Concussion Injury* MDL spent 51,000 total hours and the Court awarded 11% in common benefit fees with a fund with a present value of $982.2 million (a fee of $108,042,000). *See also*, *Wellbutrin SR Antitrust Litig.*, 2011 WL 13392296, *6 (E.D.Pa. 2011) (more than 41,000 hours spent on case was a "substantial" time commitment favoring approval of fee application); *In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F.Supp. 2d 907 (N.D. Ohio 2003) (53,671 hours submitted in litigation with common benefit fee award over $42 million).

Much like in *In re Xarelto*, *supra* at *6, "[Plaintiffs' leadership] Counsel [in this MDL] had to negotiate trial plans and coordinate various schedules, engage in extensive discovery involving millions of pages of documents from Defendants and third parties, develop Plaintiff and Defendant Profile Forms, oversee bundled complaints and expend...thousands of hours on pleadings and complex motions practice," the work-up of trial pool cases, and leadership "devoted itself to negotiating the terms of a private Settlement Agreement, which itself was time- and

labor-intensive and complex." *See also*, *Id.* at *7 (noting that counsel's diligent response to time schedules imposed by the MDL court, including attendance at monthly status conferences to discuss case developments and resolve any disputes that arose, "played a major role in bringing this matter to a prompt and successful conclusion.").   The opportunity costs and time limitations imposed by the circumstances of this MDL were likewise onerous.   For a number of years, the amount of time and effort necessary to develop and coordinate this litigation – and the complex and time-consuming negotiation of a global settlement agreement with Defendants – significantly limited involvement in other matters for the lawyers responsible for spearheading this litigation. *See*, *Xarelto*, *supra* at *6 (noting that "[t]he compressed timetable of activities…required constant attention and undoubtedly caused common benefit counsel to forego other cases and potential fees to focus on this litigation.").   Plaintiffs' counsel also had to overcome the onerous challenges of moving this litigation forward during the unprecedented COVID pandemic that struck while trial pool cases were scheduled for trial.   The burdens of funding this litigation through PSC contributions and millions of dollars in held costs strained the resources of Plaintiffs' leadership. Indeed, for some of the firms involved in leadership who were directly responsible for coordinating and leading the litigation, the work required to pursue this litigation seriously limited, if not precluded their involvement in other litigation.   Particularly the work relating to

negotiating, achieving and overseeing a settlement process that includes all MDL plaintiffs and all plaintiffs in the related New Jersey state court litigation undoubtedly required constant attention and consistent effort.

**b. <u>The Novelty and Difficulty of the Questions (Factor 2); The "Undesirability" of the Case (Factor 10)</u>**

Individually, the cases in this MDL involve complex prescription medical devices, implanted by surgeons through an invasive surgical procedure. Thus, the Plaintiffs' leadership was not only required to address the difficult legal questions that arise in product liability cases generally, but also had to navigate the unique regulatory, scientific and medical issues presented in these cases. There were also significant issues related to the plaintiffs' treating physicians, which necessitated understanding and addressing questions such as surgical skill and experience, doctor training, and patient selection, and in some cases, defenses that the doctor's surgical methodology caused or contributed to the plaintiffs' injury.

The disputed issues involved in these cases included a wide range of complicated scientific, medical and legal questions. Merely understanding from a scientific and medical perspective what was "wrong" with the Physiomesh product and with the defendants' product warnings, and how these defects caused the plaintiffs' injuries, required extensive study and research. All of these issues were, of course, bitterly disputed by the defendants. Fitting these scientific and medical concepts into the product liability legal construct, and then translating these complex

concepts into a form that a jury could understand, was exceptionally difficult. As described above, Plaintiffs' leadership was responsible for development of experts from several different scientific and medical fields.  Many of the defense's multiple experts likewise issued voluminous reports, citing to reams of scientific testing and clinical and animal study results, all of which had to be meticulously reviewed and analyzed by plaintiffs' leadership. To be prepared to handle their duties, plaintiffs' leadership was required to become knowledgeable and proficient in several diverse scientific and medical areas, and to recognize and address issues when (if not before) they arose.  *In re C.R. Bard, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, 2019 WL 385416, *8 (S.D.W.Va. 2019) (recognizing that plaintiffs' leadership "was required to develop a sophisticated expertise in medical science, the scientific method, an encyclopedic knowledge of vast scientific and medical publications.").  There was nothing routine or easy about these cases.

This litigation has also been hard-fought by the multiple defense firms involved. The defense fought to defeat the Plaintiffs' cases, filing dispositive motions on nearly every claim in every case that moved toward trial, *Daubert* challenges against nearly every one of plaintiffs' experts, attempts to limit Plaintiffs' counsel's ability to meet with treating doctors, efforts to curtail the Plaintiffs' ability to put on evidence through *in limine* motions and other means, and attempts to inject regulatory-related defenses into these cases.  In addition to drafting and responding

to the "general" motions applicable to all of the trial pool cases, the Plaintiffs' leadership also oversaw the preparation of case-specific motions and responses to defense motions filed in individual trial pool cases. *See, In re C.R. Bard, Inc.*, *supra* at *1 ("the common benefit work performed by leadership guaranteed that each plaintiff was the beneficiary of well-researched and briefed theories of liability with organized supporting factual resources and carefully developed expert opinion testimony making the case for general causation of damages resulting from allegedly defective products.").

Finally, with respect to the desirability of this litigation, the prospects of litigating a complex product liability MDL against a multi-national corporate defendant, defended by multiple top U.S. defense law firms, were daunting from the outset. The past few years of hotly-contested litigation have proven that these cases would be strongly defended. The risks and costs associated with leading this litigation have remained onerous from the beginning. Reviewing volumes of foreign language documents and having to travel abroad for depositions only increased the difficulty and undesirability of the work in this MDL. *See, In re Chinese-Manufactured Drywall*, *supra* at 502 (noting substantial litigation costs associated with travel and that difficulties associated with foreign discovery and translation presented significant risks). Again, while unanticipated at the outset, the COVID crisis only exacerbated the risks and difficulties Plaintiffs' leadership had to

overcome. Leading this litigation required fortitude and persistence, as well as substantial financial sacrifice. The well-represented corporate defendants litigated this MDL fiercely. Given the substantial costs per trial for the trial pool cases, the impediments to pursuing these cases were enormous.

### c. The Skill Required to Properly Perform the Legal Service (Factor 3); The Experience, Reputation, and Ability of the Attorneys (Factor 9)

As noted in *Jenson v. First Trust Corp.*, 2008 WL 11338161, *13 (C.D.Cal.2008), "[t]he 'prosecution and management of a complex national class action requires unique legal skills and abilities.' *Edmonds v. U.S.*, 658 F. Supp. 1126, 1137 (D.S.C. 1987)." These "unique skills and abilities" were indispensable to management of this MDL, which included thousands of individual product liability actions. The quality of the work performed in the prosecution of this MDL is reflected in the substantial global settlement inuring to the direct benefit of all MDL plaintiffs. *Jenson, supra* at *13.

Managing this complex medical device product liability MDL necessitated the involvement of some of the country's most experienced and knowledgeable attorneys in this area of the law. The lawyers appointed by the Court to lead the litigation on plaintiffs' behalf in this MDL include attorneys from law firms from across the United States with significant experience in the area of mesh litigation. These attorneys and law firms involved in Plaintiffs' leadership specialize in

representing individuals who have suffered injury from prescription drugs and medical devices and have significant experience in mesh litigation developed over many years. The collection of attorneys necessarily included a broad array of experience and skills, from the conduct of electronic discovery and analysis of voluminous document production, to motions and briefing, to deposing experts and corporate representatives and preparing to take these complex cases to trial. Other attorneys within Plaintiffs' leadership brought their knowledge and experience in mass tort settlement negotiation to bear in bringing the MDL and the related New Jersey State Court Physiomesh litigation to a global resolution. This litigation required dedicated research and study to comprehend and address the difficult and novel legal, scientific and medical issues presented in these cases. *Good v. West Virginia-American Water Co.*, 2017 WL 2884535, *24 (S.D.W. Va. 2017) (noting diligent research and education required to understand scientific and legal issues involved, which bore on analysis in awarding attorney's fees). This collective experience, knowledge and skill was vital to the success of the litigation, as these cases were defended by teams of attorneys from some of the nation's largest, most experienced and capable defense firms. As several courts considering attorney fee awards have noted, "[t]he quality of opposing counsel is also important in evaluating the quality of the work done by Plaintiffs' Counsel." *Jenson*, 2008 WL 11338161 at *14.   As noted in *In re Xarelto*, *supra* at *6 ("Common benefit counsel faced

formidable adversaries with significant resources and had to make the case credible enough to convince Defendants to resolve thousands of claims at a substantial economic cost despite not winning a single verdict in the bellwether trials."). *See also*, *Stagi v. Nat'l R.R. Passenger Corp.*, 880 F. Supp. 2d 564, 570 (E.D. Pa. 2012) ("[T]he fact that Plaintiffs' counsel obtained this settlement in the face of formidable legal opposition further evidences the quality of their work.").   The fact that the plaintiffs have been able to withstand the legal firepower brought to bear by these highly-skilled and experienced defense firms to achieve a global settlement for which all MDL plaintiffs are eligible is a testament to the experience, skill and ability of Plaintiffs' leadership.

### d.  <u>Whether the Fee is Fixed and Contingent (Factor 6)</u>

The Court's analysis under the *Johnson* factor regarding whether the fee is fixed or contingent looks to the beginning of the case with an evaluation of the serious risks of non-recovery faced by Plaintiffs' leadership when they committed themselves to this litigation on a contingency basis. *See In re Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 478 (E.D. Pa. 2008).  "Plaintiffs' Counsel's compensation for their services in this case was wholly contingent on the success of the litigation." *Meijer, Inc. v. 3M*, 2006 WL 2382718, *21 (E.D. Pa. 2006); *Hegab v. Family Dollar Stores, Inc.*, 2015 WL 1021130, *13 (D.N.J. 2015) ("Class counsel undertook this action on a contingent fee basis, assuming a substantial risk

that they might not be compensated for their efforts. . . . Courts recognize the risk of non-payment as a major factor in considering an award of attorney fees."). This factor further supports the requested common benefit award. *E.g.*, *In re Diet Drugs*, 553 F. Supp. 2d at 479 ("At the inception, and throughout this litigation, there was a substantial risk that the efforts of the Joint Fee Applicants would not be successful."); *In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 244 (E.D. Pa. 2009) (fee request reasonable where class counsel "undertook representation on a contingency basis[,] . . . advanced hundreds of thousands of dollars in expenses" and prosecuted the case "without any guarantee of payment"); *McGee v. Continental Tire of N. Am.*, 2009 WL 539893, at *15 (D.N.J. 2009) ("Class Counsel accepted the responsibility of prosecuting this class action on a contingent fee basis and without any guarantee of success or award. Accordingly, this factor weighs in favor of approval.").

e. **Nature and Length of Professional Relationship Between Attorney and Client (Factor 11)**

This *Johnson* factor was designed to consider those instances where "a lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office." *See, Johnson*, 488 F.2d at 719. There are few, if any, pre-existing relationships between the individual plaintiffs in the MDL and Plaintiffs' leadership. Although some attorney-client relationships continue beyond the settlement phase to include litigation-related matters such as health

insurance or governmental lien resolution or bankruptcy negotiation, this factor is not entitled to significant weight in the analysis.

**f. The Customary Fee (Factor 6); Fee Awards in Similar Cases (Factor 12)**

As noted in *Deepwater Horizon*, *supra* at *19, the "Customary Fee for Similar Work" analysis is largely redundant of the benchmark percentage factor, which is discussed above. Again, the 9% fee is well within the benchmark percentages for similar cases.

**(4) Even though not required under Eleventh Circuit precedent, the Nine-Percent (9%) Fee is Supported by the "Lodestar" Cross-Check.**

Again, as noted in *In re Equifax*, *supra* at 1278, there is no requirement in the Eleventh Circuit for a lodestar "cross-check" where the percentage fee award is reasonable according to the Johnson factors. *See also*, *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 2019 WL 7859557, *8 at n. 57 (N.D.Fla. 2019) (citing several cases and noting "[t]he 11th Circuit does not require that a lodestar cross-check be done in determining common benefit fee awards."). Nonetheless, the lodestar cross-check here further serves to underscore the reasonableness of a 9% fee award.

When used as a cross-check of the reasonableness of a percentage fee award, courts have observed that "[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean-counting," and that "a court performing a lodestar cross check need not scrutinize each time entry; reliance on representation by class

counsel as to total hours may be sufficient." *In re Nuvaring Prods. Liab. Litig.*, 2014 WL 7271959, *2 (E.D. Mo.2014) (citing several MDL and class action decisions). In *Jones v. Dominion Resources Services, Inc.*, 601 F. Supp. 2d 756, 765-66 (S.D.W. Va. 2009), the court similarly observed as follows:

> Because I am using the lodestar method as a cross-check, I need not apply the "exhaustive scrutiny" normally required by that method…. ("[W]here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case."); …. Instead, I may use Class Counsels' estimate of the hours they have spent working on this case.

Irrespective of what hourly rate were to be selected for the cross-check, the number of hours already expended in this litigation would yield a multiplier that would fall well within the range of reasonableness for similar litigations. Obviously, application of different hourly rates would yield a different lodestar multiplier, but the multiplier would still fall squarely within the range that courts have deemed reasonable irrespective of the hourly rate that one chose to utilize.

In *Kay Co. v. Equitable Production Co.*, 749 F. Supp. 2d 455, 470 (S.D.W. Va. 2010), the court recognized that "Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee." This is consistent with the range of similar multipliers that courts have found reasonable as set forth in the chart contained within Co-Lead Counsel's Petition.

In *In re Diet Drugs*, 582 F.3d 523, 545 (1st Cir. 2009), the First Circuit concluded that a multiplier of 3.4 "or somewhere in that neighborhood" is "not problematically high," but is instead "either below or near the average multiplier in the 'super-mega-fund' cases…." *See also*, *Deepwater Horizon*, *supra* at \*20 (lodestar multiplier of 2.34 was reasonable in light of research showing average multiplier of 3.14); *In re Avandia*, 2012 WL 6923367 at \*10 (lodestar multiplier of 2.6 was consistent with applicable jurisprudence and lower than multipliers approved in other cases); *In re Nat'l Football League Players' Concussion Injury Litig.*, 2018 WL 1635648, \*9 (E.D. Pa. 2018) (noting a lodestar multiplier of 2.96 was "well within the norm for this Circuit, which has noted that multipliers ranging from one to four are frequently awarded."). Moreover, as noted in the *NFL Players Concussion MDL*, the lodestar cross-check multiplier calculated here is artificially high, and the actual lodestar will continue to increase as common benefit work is on-going, particularly with respect to the administration and management of the global settlement as outlined above. *Id.* at \*9 n. 9. Again, whatever hourly rate is employed to perform the lodestar cross-check, the Court finds that the lodestar multiplier supports the reasonableness of the fee requested by the FCC.

## IV. ALLOCATION OF FEES AND EXPENSES

I have carefully reviewed the Plaintiffs' Co-Lead Counsel's Petition for an Award and Allocation of Common Benefit Attorneys' Fees and Expenses and

Memorandum in Support submitted by Plaintiffs' Co-Lead Counsel with respect to the proposed allocation of fees and expenses to the counsel seeking common benefit reimbursement and/or compensation. I **FIND** the recommended distribution to be fair and reasonable. I hereby **ADOPT** and **INCORPORATE BY REFERENCE** the recommendation for the allocation of fees and expenses as set forth in the petition submitted by Plaintiffs' Co-Lead and as agreed upon by all counsel seeking common benefit compensation and/or reimbursement. I hereby **ORDER** the distribution as recommended in the motion for allocation.

As described above, this Court has presided over this litigation from its inception. The Court has heard and decided volumes of motions and discovery disputes, presided over regular hearings and status conferences, as well as the pre-trial work-up of multiple trial pool cases. This Court has issued multiple written opinions during this litigation providing guidance on a variety of procedural, legal and evidentiary issues. This Court has been apprised of the status of settlement negotiations of a global settlement to include both the MDL cases as well as those pending in the related New Jersey State Court Physiomesh MCL proceeding. The Court's experience in presiding over this litigation provides the Court with unique insight into the nature and quality of the work that was performed by the lawyers and law firms before this Court. The Court is particularly familiar with the effort and dedication shown by Plaintiffs' Co-Lead Counsel in managing and developing

this litigation through the work-up of trial pool cases to negotiating and managing a global resolution.

The allocation of the common benefit fund among claimants requires an analysis that is focused on the extent to which a claimant's work contributed to the overall development and resolution of the Physiomesh litigation. Co-Lead Counsel's substantive determinations of recommended allocation of monies followed the guidance set forth in the Common Benefit Order and properly gave weight to the quality and impact of each claimant's efforts. The fact that all counsel seeking common benefit reimbursement and/or compensation agree is testament to the fairness and reasonableness of the proposed allocation by Co-Lead Counsel.

## V. CONCLUSION

Based on the foregoing, the Petition for an Award of Common Benefit Attorneys' Fees and Expenses is **GRANTED**; and the Court hereby **ORDERS** that the nine percent (9%) assessment set forth in the Court's previous Common Benefit Order shall be available for distribution as an award for common benefit expenses and attorney's fees and that the one percent (1%) assessment set forth in the Common Benefit Order shall be available for distribution for common benefit expenses. In addition, because the amount of expenses incurred for the common benefit exceed the 1% set-aside, and in order to avoid increasing the expense set-

aside, the Court **ORDERS** that the 9% attorneys' fee award may be used to pay any excess expenses (expenses that are not covered by the 1% assessment).

The court further **ORDERS** that all expenses and MDL assessments set forth in the Plaintiffs' Co-Lead Counsel's Petition for an Award and Allocation of Common Benefit Attorneys' Fees and Expenses and Memorandum in Support be dispersed to each firm in accordance with the petition. For fees that remain after the payment of expenses and assessments, the Court **ORDERS** that the common benefit funds be distributed to the common benefit firms in accordance with amounts and percentages set forth in the Petition.

SO ORDERED, this 14th day of November , 2022

RICHARD W. STORY
United States District Judge